NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-4130

_____

LUCILLE OLIVIERI,

Appellant

v.

COUNTY OF BUCKS;
DAVID NEIL, JR., C/O COUNTY OF BUCKS;
AUDREY KENNEY, C/O COUNTY OF BUCKS

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-09-cv-01240)
District Judge: Honorable Anita B. Brody

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
October 5, 2012

Before: FUENTES, FISHER and COWEN, *Circuit Judges*.

(Filed: October 24, 2012)

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

    Lucille Olivieri appeals the District Court's order granting summary judgment to

Audrey Kenny and the County of Bucks on Olivieri's claims of retaliation under 42

U.S.C. § 2000e-5 and sexual harassment under 42 U.S.C. § 1983 and 43 P.S. § 955(a). For the reasons set forth below, we will affirm.

I.

We write principally for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

Olivieri was a dispatcher in the Bucks County Communications Department from 1994 to 2010. During Olivieri's employment, the County maintained a Human Resources Policy on Non-Discrimination and Harassment ("the Policy").[1] The Policy gives an adequately broad definition of sexual harassment and "encourages reporting for all perceived incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position." The Policy also includes both formal and informal complaint procedures.

The County conducts yearly training on the Policy with all employees. Human Resources also hand-delivers a copy of each Policy revision to every County department and requires County employees to acknowledge by signature that they have received the revision and related training. Olivieri confirmed receiving copies of the Policy, its revisions, and related training on April 1, 1999, April 10, 2001, October 21, 2004, and

---

[1] The Policy was adopted on July 12, 1989. Revisions occurred on September 1, 1998, May 1, 2003, and December 21, 2005. The parties do not place any significance on the fact that the Policy was revised during Olivieri's employment.

June 8, 2007. Olivieri's supervisor, David Neil, Jr. ("Neil"), confirmed the same on March 10, 1999, April 9, 2001, October 7, 2004, October 21, 2004, and June 6, 2007. The County provides additional training for supervisors on all Human Resources policies and requires that they pass a written test.

Olivieri alleges that Neil began harassing her in 1994 while she was training to become a dispatcher. He directed comments toward her such as "fucking cunt" and would mutter "fucking bitch" as he walked by her. Neil's inappropriate behavior was not solely directed at Olivieri. A co-worker was once brought to tears because she heard Neil refer to her as "a fat pig." Neil also frequently touched co-workers, including Olivieri, in inappropriate ways. Specifically, Neil would rub a female dispatcher's shoulders and rub his groin against her back. Neil's conduct was also not limited to women or subordinate employees. Neil referred to his male supervisor, Dennis Forsyth, as "fat pig" or "fat mother fucker," although Olivieri suspects that Forsyth did not hear these remarks.

On April 12, 2004, Olivieri had a panic attack at work after Neil passed by her console and called her a "fucking slut" under his breath. A few days later, Anne Markowitz of Human Resources met with Olivieri to discuss the panic attacks and the stresses of being an emergency call dispatcher. Olivieri mentioned to Markowitz that she did not have a problem with the job; rather, she had a problem with Neil. The meeting ended, however, without Olivieri telling Markowitz that Neil had been sexually harassing employees.

On August 4, 2005, a fellow dispatcher filed a complaint about Olivieri. Squad Coordinator Kathy Kaszarek received the complaint and, on August 9, 2005, conducted interviews with Olivieri and her co-workers. Kaszarek inquired about whether harassment was occurring in the room and whether it was a hostile work environment. Although two co-workers reported work-related problems with Olivieri, no employee reported problems with Neil.

Olivieri testified that in 2006, Neil discovered that she was taking prescription pain medication, which was "something he wanted." Neil began to badger Olivieri for pills every time that he saw her, and he flipped from being "nasty and insulting" to "making a lot of sexual advances and propositions." He offered to give her oral sex, suggested that she do that for him, and bragged about his Viagra use. Olivieri was embarrassed by these particular comments, but she did not report the comments to Human Resources or to a supervisor.

In 2007, Olivieri requested to change from day to night shifts. She informed Koszarek that Neil was the reason for her request. Olivieri told Koszarek that she wanted to avoid Neil's mood swings and that Neil was hounding her for prescription drugs. After Olivieri's request to change shifts was granted, she "had little to no contact" with Neil. At one point in her deposition testimony, Olivieri stated that after her shift change, she interacted with Neil only every other Thursday for less than thirty seconds when she would pick up her paycheck and that he had "little opportunity" to rub against her or look

down her blouse. But, later, during the second day of her deposition testimony, Olivieri asked to clarify her previous testimony and stated that Neil "stalked me and confronted me and groped me until the day he retired."

In April 2007, Olivieri attended an off-site, multi-day continuing education class where Department Training Coordinator Fred Blunt led a discussion about the workplace environment. Olivieri testified that during the class, she shared that Neil was "tormenting the women" and that "she was tired of the behavior in the boys club." Olivieri, however, did not inform Blunt of Neil's specific behavior of sexual harassment. Soon after the class, Blunt expressed concern about the crude workplace culture to a group of Department employees that included Neil and Neil's supervisor, Forsyth. Neil responded by acknowledging that he needed to tone down his behavior.

On or around April 18, 2008, Human Resources began to investigate Neil after an employee, Christopher Mitchell, complained that Neil insinuated that Mitchell would not be allowed to leave early unless he gave Neil prescription pain killers. After confirming Neil's inappropriate behavior with other employees, Human Resources told Neil that he must resign or be fired. Neil retired on May 2, 2008.

In August 2008, Olivieri filed a complaint with the Pennsylvania Human Rights Commission ("PHRC") against the County and Neil for sexual discrimination. On March 20, 2009, Olivieri brought suit in the District Court against the County and Neil.

Thereafter, Olivieri experienced a number of disciplinary issues. Olivieri alleges that she was disciplined in retaliation for bringing her lawsuit.

The County's discipline system aims to punish violations of County policy in levels of increasing severity. Generally, before formal discipline begins, an employee receives informal counseling or a verbal warning for an infraction. Further violations lead to a Step I warning, Step II reprimand, Step III suspension, and Step IV termination. Discipline, however, need not proceed gradually. The discipline policy states that "[t]hough the process is intended to be progressive, some violations may warrant the bypassing of lower steps in the disciplinary process" and "[t]he immediate application of actions such as suspension, demotion and dismissal may be necessary."

On May 18, 2010, Olivieri was seen using her cell phone while at work against Department policy, which led to a Step I disciplinary notice. The notice referenced two previous occasions on which Olivieri had been verbally warned about the same behavior. At some point during Olivieri's escalating discipline, Assistant Director of Human Resources Meredith Dolan asked Deputy Director Audrey Kenny to take over as the sole disciplinarian for Olivieri. According to Kenny, this was done because Olivieri complained of harassment when lower-level supervisors disciplined her and Kenny needed to ensure that discipline "was consistently applied." Kenny testified that her role in Olivieri's discipline had nothing to do with Olivieri's legal proceedings.

6

In June 2010, Olivieri committed three separate infractions, each of which standing alone would have been sufficient to warrant Step II discipline: (1) Ed Boshell, Olivieri's supervisor, reported that she called him a "pussy" in anger, although Olivieri denies using this word;[2] (2) Olivieri refused to give her cell phone to Boshell when he observed her using it and called him a "liar"; and (3) Ginny Rosner, Olivieri's co-worker, reported: "I heard Lucy Olivieri [make] the comment that if she had to listen to my voice anymore she'd put a bullet in the back of my head."

Olivieri's eventual Step III discipline occurred because of her job performance: on June 13, 2010, Olivieri fielded a call for a domestic disturbance but incorrectly coded the call as a disorderly person incident. Olivieri's eventual Step IV termination was imposed for additional instances of poor job performance and insubordination: when Squad Coordinator David Hagerty met with Olivieri on June 19, 2010, to review her mishandled calls, Olivieri stated, "I could care less what you have to say." She was subsequently sent home for insubordination.

Due to excused sick time and unpaid absences, Olivieri did not return to work until June 28, 2010. When she did return to work, she was given a written notice of her Step II discipline. For the next month and a half, Olivieri again did not report to work for a variety of reasons including vacation, conferences, and sick time. Upon returning to

---

[2] We agree with the District Court that this he-said, she-said dispute does not concern a material fact. As noted, any one of Olivieri's June 2010 infractions could have warranted Step II discipline.

work on August 23, 2010, Olivieri was given her Step III disciplinary notice and a Step IV termination notice. On September 20, 2010, Olivieri amended the complaint in this action to name Kenny as a defendant and to add retaliation claims.

On August 15, 2011, the District Court granted summary judgment to the County and Kenny on all claims. The District Court granted Olivieri's voluntary dismissal of Neil on November 7, 2011. On November 10, 2011, Olivieri filed a Notice of Appeal of the order granting summary judgment to the County and Kenny.

II.

The District Court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. The District Court had supplemental jurisdiction over Olivieri's state law claim under 28 U.S.C. § 1367. This Court has jurisdiction under 28 U.S.C. § 1291.

This Court exercises plenary review over a district court's order granting summary judgment. *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005). Summary judgment is appropriate when the moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and the dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue

for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.

## A.

Olivieri brought suit against the County and Kenny under Title VII for disciplining and terminating her in retaliation for bringing a sexual harassment action against the County. Title VII prohibits employers from discriminating against employees because they have "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000-e(a).

Title VII retaliation actions based on a claim of pretext are subject to a burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973). The plaintiff must first carry the initial burden of establishing a *prima facie* case by tendering evidence that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006).

The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell*, 411 U.S. at 802. Once the employer meets this burden of production, the burden rebounds to the plaintiff, who must then show by a preponderance of the evidence that the employer's

9

explanation is pretextual. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably find pretext. *Id.* at 764.

The District Court found that Olivieri failed to establish the causation element of her *prima facie* case and that, even if she had established causation, she cannot rebut the County's legitimate, nondiscriminatory reasons for her discipline and termination. We agree. Central to our holding is the fact that Olivieri's repeated infractions were not trivial; rather, her conduct was uniformly prohibited by policies applicable to all employees. The fact that she received a Step IV termination for conduct that occurred before she received a notice for Step II and Step III discipline does not indicate retaliatory motive. The discipline policy states that "[t]hough the process is intended to be progressive, some violations may warrant the bypassing of lower steps in the disciplinary process" and "[t]he immediate application of actions such as suspension, demotion and dismissal may be necessary."

Also, Kenny's involvement in Olivieri's discipline indicates neither a causal connection nor pretext in the County's decision-making. Because Olivieri had previously complained of harassment when she received discipline from lower-level supervisors, Kenny took over as the sole disciplinarian to ensure that Olivieri would not be treated unfairly by individual supervisors and to ensure that discipline "was consistently applied." Kenny testified that her role in Olivieri's discipline had nothing to do with

10

Olivieri's legal proceedings, and Olivieri has put forth only conclusory allegations to the contrary. Olivieri therefore has failed to put forth evidence from which a reasonable jury could infer that she was retaliated against in contravention of Title VII.

B.

Olivieri also brought suit against the County under 42 U.S.C. § 1983 for deliberately ignoring Neil's pattern of sexual harassment and failing to train Neil to refrain from such harassment. Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

Local government bodies are "persons" within the meaning of § 1983. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). A local government, however, cannot be held liable under § 1983 on a theory of *respondeat superior*. *Id.* The touchstone of a § 1983 action is an allegation that an official *policy* is responsible for a constitutional deprivation, but local governments may also be sued for constitutional deprivations pursuant to a *custom*. *Id.* at 690-91.

A custom can be proven by showing that a policymaker acquiesced to a course of conduct that is so widespread as to have the force of law. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). This does not mean, however, that the policymaker must be specifically identified by the plaintiff's evidence; rather, practices so widespread

11

as to have the force of law are ascribable to local government policymakers. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). If custom is established by proof of knowledge and acquiescence, then a single application of the custom can suffice to show liability. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989).

Contrary to Olivieri's contention that the County had a custom of tolerating Neil's conduct, the evidence does not demonstrate that Neil's conduct was widespread to the point that a policymaker must have known and acquiesced in it. When Olivieri met with Anne Markowitz of Human Resources in April 2004, she failed to notify Markowitz of Neil's sexually harassing behavior. Moreover, in August 2005, when Squad Coordinator Kathy Kaszarek interviewed Olivieri and her co-workers regarding a hostile work environment, no employee reported problems with Neil. Instead, two employees reported having work-related problems with Olivieri. In 2007, when Olivieri told Koszarek that she wanted to avoid Neil's mood swings and that he was hounding her for prescription drugs, Olivieri was granted a shift change, after which she "had little to no contact" with Neil.

After the shift change, when Olivieri informed Department Training Coordinator Fred Blunt that Neil was "tormenting the women" and that "she was tired of the behavior in the boys club," Blunt confronted Neil and Neil's supervisor regarding his conduct. In April 2008, when it was discovered that Neil's conduct had not changed, Human Resources informed Neil that he must resign or be fired.

12

We agree with the District Court's conclusion that the evidence shows that a single employee regularly sexually harassed some of his colleagues and subordinates until more senior County officials learned of his behavior, at which time he was forced to resign or be fired. At all times relevant to his case, the County maintained an official policy that clearly prohibited sexual harassment. The County also provided updates and training to employees with regard to revisions in the policy. There is no evidence of a general custom tolerated by the County on which a reasonable fact finder could premise liability.[3]

C.

Olivieri also appeals the District Court's order granting summary judgment to the County with regard to her sexual harassment claim under the Pennsylvania Human Relations Act ("PHRA"). The PHRA prohibits employers from discriminating against any individual "with respect to compensation, hire, tenure, conditions, or privileges of employment" because of an individual's sex. 43 P.S. § 955(a). To bring a PHRA claim, a plaintiff must file an administrative complaint with the PHRC within 180 days of the alleged act of discrimination. 43 P.S. §§ 959(a), 959(h), and 962. "If a plaintiff fails to

---

[3] Olivieri, on appeal, makes a conclusory assertion that the County failed to train Neil to refrain from sexual harassment, yet Olivieri makes no real argument as to why the District Court's dismissal of this claim was in error. We agree with the District Court that Olivieri has not supported her contention that the County was deliberately indifferent in creating or implementing its training program, or that its training program caused her injury.

file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997).

We agree with the District Court's determination that Olivieri's PHRA claim is time-barred because she failed to adequately describe a single incident of discrimination that occurred within 180 days of her filing with the PHRC. Olivieri filed her complaint with the PHRC in August 2008. The alleged incidents of harassment occurred prior to 2007. There is no evidence that Olivieri was subjected to any sexual harassment after her request to change shifts was granted in 2007. Olivieri testified that after her request to change shifts was granted, she "had little to no contact" with Neil. Notably, Olivieri points out that later, during the second day of her deposition testimony, she asked to clarify previous testimony and then stated that Neil "stalked me and confronted me and groped me until the day he retired." Even if we ignore the contradiction in Olivieri's testimony, this vague statement is insufficient to create a genuine issue of material fact for trial.

## IV.

For the foregoing reasons, we will affirm the District Court's order granting summary judgment to Audrey Kenny and the County of Bucks on Olivieri's claims of retaliation and sexual harassment.